IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, | No. 85086-5-I |
| Respondent, | |
| v. | DIVISION ONE |
| BRYCE AMIR HARDY, | UNPUBLISHED OPINION |
| Appellant. | |

CHUNG, J. — Following a shooting event in which he killed one person and injured two others, Bryce Hardy was convicted of murder in the first degree by extreme indifference to human life, two counts of assault in the first degree, and one count of unlawful possession of a firearm in the second degree, as well as three firearm enhancements for the murder and assault counts. He challenges the convictions for murder in the first degree by extreme indifference to human life and assault in the first degree based on insufficient evidence. He also seeks relief from his 35-year sentence, arguing that mandatory, consecutive firearm enhancements are unconstitutional as applied to him as a youthful offender or, in the alternative, because the sentence is unconstitutionally cruel under a categorical bar analysis, which considers whether a sentence is categorically unconstitutional based on the nature of the offender class. Additionally, he challenges the imposition of the victim penalty assessment (VPA) and interest on restitution, based on recent statutory amendments. We affirm Hardy's convictions and remand to strike the VPA from his sentence.

FACTS

On September 13, 2019, at around 9:19 p.m., then-20-year-old Hardy was with friends in downtown Seattle.[1] While he was across the street from his friends, the friends encountered Dawda Corr, Steven Mostajo, and Joseph Browder. Mostajo and Corr got into a "physical skirmish" with one of Hardy's friends and a verbal exchange with another. Corr, Mostajo, and Browder left and entered the transit tunnel and went down to the northbound platform. Shortly after, Hardy, having been told what happened, entered the Westlake light rail station and went to the main northbound platform. Hardy walked quickly, then ran toward Corr, Mostajo, and Browder.

A bystander who was next to the group, Marc Pedraza, testified Hardy stated something to the three before he began shooting at Corr and Mostajo. Another witness, Paul Nelson, testified that he did not hear any argument or exchange of words before Hardy began firing. Hardy fired his handgun approximately 12 times. When firing at Corr, Hardy appeared to be tracking his movements. His shots struck Corr five times and struck Mostajo and Pedraza as well. Mostajo was struck in his right thigh near his femoral artery and nearly died from blood loss.

Hardy initially fled the scene, but police apprehended him three days later. Seattle Police located 12 fired cartridge casings in the tunnel on both the north and south sides of the platforms, as well as bullet fragments on both sides of the tracks and platforms.

---

[1] Because Hardy does not challenge the court's findings of fact, they are verities on appeal. State v. A.M., 163 Wn. App. 414, 419, 260 P.3d 229 (2011) ("Where there are findings of fact, as in a bench trial, unchallenged findings of fact are verities on appeal."). Accordingly, the facts in this section are drawn from the court's unchallenged findings.

Following a bench trial, Hardy was found guilty of murder in the first degree by extreme indifference to human life. The court found that Hardy acted with intent to cause Corr's death but did not find beyond a reasonable doubt that the intent was premediated. The court also found Hardy guilty of two counts of assault in the first degree, and one count of unlawful possession of a firearm in the second degree. By special verdict, the court found Hardy was armed with a firearm when he committed the murder and assaults.

Given Hardy's convictions, the total standard range for his crimes was 637 to 787 months (53 to 65.5 years). Hardy represented himself at sentencing and asked the court to impose a mitigated exceptional sentence of 20 years based on his youthfulness at the time of the offenses, coupled with his prior traumatic brain injury (TBI). The court granted Hardy's request for a downward departure from the standard range based on Hardy's age and his TBI. However, the court noted:

> Under the law for a murder, I am required to sentence you to a minimum of 20 years, and I am also under our existing law required to sentence you to 5 years on each count for the firearms enhancement . . . And I am going to run the firearms enhancement for each of those three crimes consecutively for a total of 35 years.
>
> I want to be clear on the record that this is what I believe is an appropriate sentence. It creates the possibility that you can have some life when you get out at the other end and be rehabilitated.
>
> I do find that as the 15-year consecutive sentences that I currently do not have discretion. And so should the court at some point, the Appellate Court or the Supreme Court, at some point in the future decide that judges should have discretion about whether to run those five-year enhancements concurrently or consecutively, I believe that that could be a basis to revisit your sentence.
>
> As to the 20 years, I also do not believe I have discretion, but I would not exercise discretion to sentence you to less than 20 years for the

3

taking of a life and the serious first-degree assault on two other individuals.

The court also imposed a VPA and restitution in the amount of $8,505.05. Hardy timely appeals.

DISCUSSION

On appeal, Hardy argues insufficient evidence supports his convictions for murder and for the assault of Pedraza.[2] Hardy also contends that the sentencing court has discretion not to impose consecutive firearm enhancements because of his youthfulness or, in the alternative, that mandatory and consecutive firearm enhancements are unconstitutional as applied under a categorical bar analysis. Finally, Hardy requests remand to strike the VPA from the judgment and sentence based on his indigency, and for the sentencing court to determine whether to impose interest on the restitution given recent statutory amendments.

I.  Sufficiency of the Evidence

Due process requires that the State prove every element of a crime beyond a reasonable doubt. State v. Johnson, 188 Wn.2d 742, 750, 399 P.3d 507 (2017). To determine whether sufficient evidence supports a conviction, an appellate court must "view the evidence in the light most favorable to the prosecution and determine whether any rational fact finder could have found the elements of the crime beyond a reasonable doubt." State v. Homan, 181 Wn.2d 102, 105, 330 P.3d 182 (2014). A claim of

---

[2] Hardy raised these insufficiency challenges in a statement of grounds for additional review (SAG). He also filed a "Supplemental Pro Se Statement of Additional Grounds." While RAP 10.10(d) allows the defendant to file a SAG, "[t]he statement of additional grounds for review should be filed within 35 days after the filing of the brief filed by the defendant's counsel." As Hardy filed his supplemental SAG over four months after oral argument, it does not comply with RAP 10.10(d). Accordingly, we decline to address it.

insufficient evidence admits the truth of the State's evidence and all reasonable inferences from that evidence. State v. Salinas, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). All reasonable inferences must be interpreted in favor of the State and "most strongly against the defendant." Id. Whether sufficient evidence supports a defendant's conviction is a question of law reviewed de novo. State v. Rich, 184 Wn.2d 897, 903, 365 P.3d 746 (2016).

A. First Degree Murder by Extreme Indifference to Human Life

Under Washington law, there are three ways to commit murder in the first degree (1) premeditated murder, (2) murder by extreme indifference to human life, and (3) aggravated (felony) murder. RCW 9A.32.030(1). Of these three crimes, only premeditated murder requires an intent to kill. RCW 9A.32.030(1)(c); See State v. Canela, 199 Wn.2d 321, 334, 505 P.3d 1166 (2022). A person commits murder with extreme indifference to human life if they "engage[] in conduct which creates a grave risk of death to any person, and thereby causes the death of a person." RCW 9A.32.030(1)(b). The difference between intentional murder and extreme indifference murder depends on whether the defendant's actions endangered life in general or simply endangered the life of a particular victim. State v. Berge, 25 Wn. App. 433, 437, 607 P.2d 1247 (1980).

Hardy contends that because the trial court found that he intended to kill Corr, he could not act with extreme indifference. We disagree. Intent to kill does not necessarily preclude a conviction of murder by extreme indifference to human life, and there was sufficient evidence supporting Hardy's conviction of the latter. Hardy may have intended to shoot at Corr, but the trial court found that "[w]hen Hardy fired his handgun at Mostajo

and Corr, there were over 20 people, on the northbound light rail platform, many of whom were in the potential line of fire as Hardy fired in a northbound direction." "There were also several people on the southbound platform," with 30 or more people on the two platforms, not including Hardy and his friends or Corr and his friends. Police found bullet casings and fragments scattered along both platforms.

Hardy compares his case to Berge and State v. Anderson, 94 Wn.2d 176, 616 P.2d 612 (1980), but in both of these cases, the defendants directed their actions at specific individuals and did not endanger anyone else. Berge, 25 Wn. App. at 434 (defendant fired 30 shots into victim sleeping on couch in defendant's home); Anderson, 94 Wn.2d at 178-79 (defendant placed child in tub filled with scalding hot water). By contrast, Hardy's actions endangered an entire crowd of people, not just Corr. Indeed, that danger was evinced by the fact that an uninvolved bystander, Pedraza, was shot. Therefore, when viewed in a light most favorable to the State and assumed true, the unchallenged findings support the conclusion that Hardy acted with extreme indifference to the lives of all the people in the crowd on the platform when he shot at Corr.

### B.  Assault in the First Degree

Hardy also argues there was insufficient evidence to support the conviction for assault in the first degree of Pedraza. Specifically, he argues that "intent to inflict great bodily harm cannot transfer to an unintentional victim . . . after the intended crimes are accomplished against the intended victims."[3]

---

[3] Hardy also argues that the conviction must be vacated because the jury instruction omitted the mens rea requirement concerning transferred intent. While Hardy cites to "Proposed Jury Instructions Reviewed by Court page 104," these documents are not part of the record on appeal. "[T]he appellate court is not obligated to search the record in support of claims made in a defendant's [SAG]." RAP 10.10(c). In any case, this was a bench trial, and the court explicitly addressed transferred intent for the assault in its conclusions of law, so Hardy's sufficiency challenge raises the same legal issue as his jury instruction claim.

The relevant statute states, "A person is guilty of assault in the first degree if he or she, with intent to inflict great bodily harm . . . [a] Assaults another with a firearm or any deadly weapon . . . likely to produce great bodily harm or death." RCW 9A.36.011(1)(a). The definition of "[g]reat bodily harm" includes "bodily injury which creates a probability of death." RCW 9A.04.110(4)(c). In its conclusions of law, the trial court determined that the elements of assault in the first degree against Pedraza were proven beyond a reasonable doubt, including that "Hardy acted with intent to inflict great bodily harm (there was no intent as to Pedraza, but there was transferred intent based on the intent to inflict great bodily harm on Corr and Mostajo)."

In State v. Elmi, the Washington Supreme Court addressed the doctrine of transferred intent in the context of an assault. 166 Wn.2d 209, 207 P.3d 439 (2009). There, the defendant fired gunshots at his estranged wife's house when their three-year-old child and the wife's two siblings, ages three and five, were home. Id. at 211. No one was physically injured, but a jury convicted him of attempted murder of his wife and assault in the first degree against the children. Id. at 211-12. The defendant argued the State had to prove specific intent to assault the children. Id. at 216. The court disagreed and held that "once the intent to inflict great bodily harm is established, usually by proving that the defendant intended to inflict great bodily harm on a specific person, the mens rea is transferred under RCW 9A.36.011 to any unintended victim." Id. at 218.

Here, the court's conclusion regarding transferred intent is a correct legal conclusion based on Elmi. The court found that Pedraza saw Hardy begin shooting at Corr and Mostajo, and that Hardy tracked Corr's movements as he was firing his gun at him. The court further found that Hardy continued to fire his gun at Corr "after Corr had

7

been hit by gunfire and after Corr had turned his body away from Hardy. Hardy stopped only after Corr collapsed to the ground." Another witness, Nelson, also testified that Hardy was aiming at specific targets rather than randomly shooting. Additionally, the court found that Corr died from one or more of the gunshot wounds and that Mostajo was struck by bullets in his right thigh near his femoral artery, causing him to nearly die. This evidence supports the conclusion that Hardy intended to inflict great bodily harm on Corr and Mostajo. This intent was sufficient under Elmi to support the conclusion that there was transferred intent as to the other victim, Pedraza. Thus, there was sufficient evidence to prove the element of intent and to convict Hardy for assault in the first degree of Pedraza.

## II. Firearm Enhancements

Hardy argues that the trial court erred when it asserted it had no discretion in imposing the firearm enhancements. He contends that under State v. Houston-Sconiers, 188 Wn.2d 1, 391 P.3d 409 (2017), and In re Pers. Restraint of Monschke, 197 Wn.2d 305, 482 P.3d 276 (2021) (plurality opinion), a trial court has discretion to run firearm enhancements concurrently for a youthful offender like Hardy. Alternatively, he argues that this court should hold, based on a categorical bar analysis, that mandatory enhancement stacking as applied to a youthful defendant is cruel punishment in violation of the state constitution."

"We will reverse a sentencing court's decision only if we find 'a clear abuse of discretion or misapplication of the law.' " State v. Delbosque, 195 Wn.2d 106, 116, 456 P.3d 806 (2020) (internal quotations marks omitted) (quoting State v. Blair, 191 Wn.2d 155, 159, 421 P.3d 937 (2018)). A court abuses its discretion when " its decision is

manifestly unreasonable or based upon untenable grounds. " Delbosque, 195 Wn.2d at 116 (internal quotation marks omitted) (quoting State v. Lamb, 175 Wn.2d 121, 127, 285 P.3d 27 (2012)).

### A.  Mandatory Sentences for Youthful Offenders

In Houston-Sconiers, the Washington Supreme Court held that when "sentencing juveniles in the adult criminal system, a trial court must be vested with full discretion to depart from the sentencing guidelines and any otherwise mandatory sentence enhancements, and to take particular circumstances surrounding a defendant's youth into account." 188 Wn.2d at 34. In Monschke, a plurality of the court recognized that 18- to 20-year-olds may also demonstrate youthful characteristics, so before sentencing them to life without parole (LWOP) for aggravated murder in the first degree pursuant to RCW 10.95.030, trial courts must have the discretion to consider their youth. 197 Wn.2d at 307-08, 326.

Hardy argues that Monschke applies to any mandatory sentence or enhancement. The State responds that for youthful offenders aged 18 to 20, mandatory sentences other than LWOP are not unconstitutional. We agree with the State.

The Sentencing Reform Act of 1981 (SRA), chapter 9.94A RCW, requires a mandatory five-year enhancement if the offender or an accomplice was armed with a firearm. RCW 9.94A.533(3)(e).[4] In State v. Brown, the court held this statute clearly indicates that deadly weapon enhancements are mandatory, must be served in total

---

[4] RCW 9.94A.533(3)(e) states, "Notwithstanding any other provision of law, all firearm enhancements under this section are mandatory, shall be served in total confinement, and shall run consecutively to all other sentencing provisions, including other firearm or deadly weapon enhancements, for all offenses sentenced under this chapter."

confinement, and cannot be reduced below the times specified in the statute.[5] 139 Wn.2d 20, 28-29, 983 P.2d 608 (1999). And, more recently, the court in State v. Kelly observed that "the plain language under RCW 9.94A.533(3)(e) indicates that firearm enhancements *must* be run consecutively." 4 Wn.3d 170, 192, 561 P.3d 246 (2024). Further, the court in Kelly pointed to the statute's mandatory language that the sentence "*shall* be served in total confinement, and *shall run consecutively* to all other sentencing provisions, *including other firearm or deadly weapon enhancements*." RCW 9.94A.533(3)(e) (emphasis added). Kelly declined to reconsider Brown because the defendant failed to establish that the court's "interpretation of the deadly weapon enhancement statute in Brown is incorrect, particularly where the legislature has not amended the statute post-Brown." Kelly, 4 Wn.3d at 192. Thus, Brown remains good law. See id. Additionally, this court has expressly held that "Houston-Sconiers overrules Brown only as it applies to juveniles." State v. Mandefero, 14 Wn. App. 2d 825, 831, 473 P.3d 1239 (2020).[6]

Notwithstanding Brown, Kelly, and Mandeforo, Hardy argues that the decision in Monschke and its underlying principles extended the Houston-Sconiers exception to all youthful offenders. Specifically, he contends he is entitled to relief based on Monschke's language regarding the prohibition of cruel punishment under article I, section 14 of our

---

[5] The analysis in Brown referenced RCW 9.94A.310(4)(e). However, chapter 9.94A RCW has been amended several times since Brown. These amendments have not affected this language or the subsequent statutory analysis. Kelly, 561 P.3d at 258 n.15, see also RCW 9.94A.533(3)(a). Therefore, as did the court in Kelly, we reference the current version of the statute.

[6] Hardy also argues that that sentencing court did not acknowledge whether it would "extend the line of case logic" from In re Personal Restraint of Mulholland, 161 Wn.2d 322, 328, 166 P.3d 677 (2007), and State v. McFarland, 189 Wn.2d 47, 399 P.3d 1106 (2017), to run the firearm enhancements concurrently. But this court rejected this argument in Mandefero, 14 Wn. App. 2d at 831-32 and State v. Wright, 19 Wn. App. 2d 37, 51-53, 493 P.3d 1220 (2021). Both Mandefero and Wright distinguished McFarland and Mulholland because they dealt with sentences for firearm-related offenses, not the mandatory firearm enhancement. Mandefero, 141 Wn. App. 2d at 832; Wright, 19 Wn. App. 2d at 52.

state constitution, Houston-Sconier's discussion of mandatory sentence disproportionality, and the lack of any reasoned distinction between juveniles and 18- to 20-year-olds.

"Even where it is already established that the Washington Constitution may provide enhanced protections on a general topic, parties are still required to explain why enhanced protections are appropriate in specific applications." State v. Ramos, 187 Wn.2d 420, 454, 387 P.3d 650, cert. denied, 583 U.S. 995, 138 S. Ct. 467, 199 L. Ed. 2d 355 (2017). Washington courts consider six nonexclusive criteria to determine whether the Washington Constitution's ban on cruel punishment is broader than the Eighth Amendment in a specific context (1) the text of the state constitution, (2) significant differences in parallel provisions of the federal and state constitutions, (3) state constitutional and common law history, (4) preexisting state law, (5) structural differences between the federal and state constitutions, and (6) matters of particular state interest or local concern. State v. Gunwall, 106 Wn.2d 54, 61-62, 720 P.2d 808 (1986).

Hardy acknowledges that a Gunwall analysis is necessary because "the situation is not identical to prior decisions" and he "was over 18 and was sentenced to a different form of mandatory sentencing." Yet Hardy relies almost exclusively on the Gunwall analysis in State v. Bassett, 192 Wn.2d 67, 428 P.3d 343 (2018). The State argues that Bassett dealt only with "the constitutionality of sentencing juvenile offenders to life in prison without the possibility of parole or early release," Bassett, 192 Wn.2d at 72, whereas here, Hardy presents "a very different circumstance" by challenging the

11

"[s]entencing [of] a young adult to the minimum sentence allowed by law." We agree with the State.

Hardy provides only one argument distinguishable from the analysis in Bassett, under the fourth Gunwall factor, which considers whether "established bodies of state law, including statutory law, may also bear on the granting of distinctive state constitutional rights." Gunwall, 106 Wn.2d at 61. Hardy argues that regarding his specific cohort of immature 18- to 20-year-olds, O'Dell[7] and Monschke[8] "expanded Miller[9] principles beyond Eighth Amendment jurisprudence." We decline the invitation to conclude that imposing a mandatory firearm enhancement on a youthful offender is "cruel punishment" under article I, section 14. Monschke is limited to its specific context, mandatory LWOP for an aggravated murder conviction for youthful offenders aged 18 to 20. See 197 Wn.2d at 329.[10] In Monschke, the lack of discretion to consider youth under the aggravated murder statute, RCW 10.95.030, "was a key factor in the lead opinion's analysis, which reasoned that RCW 10.95.030 was unconstitutional as applied." In re Pers. Restraint of Davis, 200 Wn.2d 75, 83, 514 P.3d 653 (2022) (determining Monschke was not material to a defendant convicted of crimes committed at age 21 that did not require a life sentence).

---

[7] State v. O'Dell, 183 Wn.2d 680, 358 P.3d 359 (2015). But in O'Dell, the court did not rely on a constitutional analysis, but rather, considered *statutory factors* under the SRA to conclude that a "defendant's youthfulness can support an exceptional sentence below the standard range applicable to an adult felony defendant, and that the sentencing court must exercise its discretion to decide when that is." 183 Wn.2d at 688, 698-99.

[8] 197 Wn.2d at 329.

[9] Miller v. Alabama, 567 U.S. 460, 489, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012) (holding mandatory LWOP for those under the age of 18 at the time of their crimes violates the Eighth Amendment's prohibition on cruel and unusual punishments).

[10] See, e.g., In re Pers. Restraint of Kennedy, 200 Wn.2d 1, 23 n.5, 513 P.3d 769 (2022) ("To the extent Kennedy suggests that Monschke announced a broad principle requiring the consideration of youth at all sentences received by young adults under the Sentencing Reform Act of 1981, ch. 9.94A RCW, he identifies no reasoning in Monschke that extends its holding beyond the context of mandatory LWOP sentences or any reasoning that extends Houston-Sconiers's holding").

Hardy also notes in State v. Carter, 3 Wn.3d 198, 208, 548 P.3d 935 (2024), the court affirmed the imposition of concurrent firearm enhancements on a youthful offender. But this comparison is unhelpful because the defendant in Carter, like the defendant in Monschke, was sentenced to mandatory LWOP for aggravated murder in the first degree. Carter does not support an extension of Monschke to 18- to 20-year-olds convicted of other crimes.

In sum, Monschke does not provide courts the discretion to depart from mandatory firearm enhancements as Hardy contends. Rather, the sentencing court was required to consider the statutory factors under the SRA to determine whether Hardy's youthfulness supported an exceptional sentence downward on the crime of conviction, which it did. Outside of this obligation pursuant to O'Dell, 183 Wn.2d 680, the court was required to impose a mandatory, consecutive 5-year firearm enhancements per RCW 9.94A.533(3)(a) and did not abuse its discretion when it did so.

B. Categorical Bar Analysis

In the alternative, again relying on Bassett, 192 Wn.2d 67, Hardy argues that under a categorical bar analysis, his sentence constitutes unconstitutional cruel punishment under article I, section 14 of the Washington Constitution.[11] The State disagrees, highlighting that Hardy's reliance on Bassett's categorical bar analysis is misplaced given Bassett's narrow holding relating to LWOP for juveniles.[12] We agree with the State.

---

[11] Consistent with the Washington Supreme Court's decision in Bassett, Hardy does not engage with a Fain proportionality analysis to assess his cruel punishment claim, as the court found it inappropriate when considering categorical challenges. Bassett, 192 Wn.2d at 85 (citing State v. Fain, 94 Wn.2d 387, 617 P.2d 720 (1980)). Thus, we need not conduct a proportionality analysis.

[12] Indeed, in State v. Anderson, the court emphasized that "Bassett's categorical bar reasoning does not speak to term-of-years sentences." 200 Wn.2d 266, 283, 516 P.3d 1213 (2022).

The animating question for the categorical bar analysis is whether a sentence is "categorically unconstitutional based on the nature of the . . . offender class," Bassett, 192 Wn.2d at 83—in this instance, youthful offenders aged 18-20. "The categorical approach 'requires consideration of the culpability of the offenders at issue in light of their crimes and characteristics, along with the severity of the punishment in question' and whether the sentence 'serves legitimate penological goals.' " Id. (quoting Graham v. Florida, 560 U.S. 48, 130 S. Ct. 2011, 176 L. Ed. 2d 825 (2010)). "Issues of culpability, the severity of the punishment, and whether penological goals are served all allow the court to include youth-specific reasoning into the analysis." Bassett, 192 Wn.2d at 84.

"The first step in the categorical bar analysis is to determine whether there is a national consensus" against sentencing youthful offenders "by looking at 'objective indicia of society's standards, as expressed in legislative enactments and state practice.' " Id. at 85 (internal quotation marks omitted) (quoting Graham, 560 U.S. at 61). " '[T]he clearest and most reliable objective evidence of contemporary values is the legislation enacted by the country's legislatures.' " Bassett, 192 Wn.2d at 85-86 (quoting Graham, 560 U.S. at 62). The second step, the judicial exercise of independent judgment, "requires consideration of 'the culpability of the offenders at issue in light of their crimes and characteristics, along with the severity of the punishment in question' and 'whether the challenged sentencing practice serves legitimate penological goals.' " Bassett, 192 Wn.2d at 87 (quoting Graham, 560 U.S. at 67).

As for the first consideration, Hardy contends that although the Monschke court found it unnecessary to engage with a categorical bar test given its findings in Bassett (i.e., that mandatory LWOP is unconstitutionally cruel as applied to juveniles), it

14

nevertheless highlighted there is a "national trend worthy of note" to carve out rehabilitative space for "young" or "youthful" offenders as old as their mid-20s, citing Monschke, 197 Wn.2d at 312 n.8 (citing legal developments in seven states and three white papers). Hardy notes that since Monschke was decided, two more states, Illinois and Connecticut, have joined this trend.[13] But the trend noted in Monschke relates to mandatory LWOP sentences for youthful offenders—not a trend toward sentencing discretion for otherwise mandatory sentencing enhancements. Thus, the first step of the categorical bar analysis does not weigh in favor of finding that courts have discretion to depart from mandatory sentencing guidelines for youthful offenders.

Further, "while the showing of a national consensus is entitled to great weight, it is 'not itself determinative' of whether a punishment is cruel." State v. Reynolds, 2 Wn.3d 195, 207, 535 P.3d 427 (2023) (internal quotations marks omitted) (quoting State v. Moretti, 193 Wn.2d 809, 823, 446 P.3d 609 (2019). Under the second step, the court must "exercise [its] independent judgment" and consider the culpability of the offender in light of their crimes, characteristics, and the severity of punishment they receive. Bassett, 192 Wn.2d at 87.

In this case, none of the crimes for which Hardy was convicted required a sentence of mandatory LWOP. As for the severity of his punishment, Hardy received an exceptional sentence (before the imposition of the firearm enhancements) of 20 years, well below the low end of the standard range that the SRA would otherwise require for

---

[13] See 730 ILL. COMP. STAT. 5/5-4.5-115(b) (as of 2020, with exception of those convicted of first degree murder, persons under 21 years old at the time of offense are parole-eligible after serving 10 years); CONN. GEN. STAT. § 54-125a(g) (in 2023, Connecticut expanded the eligibility parameters for parole for people under the age of 21 who received a definite sentence of more than 10 years of incarceration).

the murder.[14] The trial court appropriately considered the mitigating qualities of Hardy's youth and his prior TBI in deciding to depart down from the standard sentencing range, as contemplated in O'Dell.[15] Hardy argues that a sentence of 35 years due to mandatory enhancements results in a categorically unconstitutional sentence as it applies to youthful offenders. But a lengthy sentence for a youthful offender is not necessarily unconstitutional. State v. Carter, 3 Wn.3d 198, 224, 548 P.3d 935 (2024) (holding that a 46-year sentence for 18-year-old was appropriate given "detailed findings by the superior court [that] comported with the requirements of individualized consideration of the mitigating qualities of youth").

The second step of the categorical bar analysis also requires the court to consider whether the penological goals of retribution, incapacitation, rehabilitation, and deterrence are served by this sentence. Bassett, 192 Wn.2d at 88. "In 1995, the Legislature enacted, without amendment, Initiative 159, entitled 'Hard Time for Armed Crime.' " Brown, 139 Wn.2d at 25. "Initiative 159 'split the previous deadly weapon enhancement into separate enhancements for firearms and for other deadly weapons, and broadened their application to all felonies except those in which using a firearm is an element of the offense.' " Id. Thus, this new law explicitly intended to increase sentences for armed crime. Id. The statute's goals of retribution and incapacitation are served through the imposition of the mandatory firearm enhancements. Similarly, the

---

[14] RCW 9.94A.540(1)(a) controls mandatory minimum sentences and states "an offender convicted of the crime of murder in the first degree shall be sentenced to a term of total confinement not less than twenty years."

[15] O'Dell, 183 Wn.2d at 698-99 (holding "a defendant's youthfulness can support an exceptional sentence below the standard range applicable to an adult felony defendant, and that the sentencing court must exercise its discretion to decide when that is"); see also In re Pers. Restraint of Light-Roth, 191 Wn.2d 328, 336, 422 P.3d 444 ("RCW 9.94A.535(1)(e) has always provided the opportunity to raise youth for the purpose of requesting an exceptional sentence downward, and mitigation based on youth is within the trial court's discretion.").

sentence aligns with the goal of rehabilitation, given the court's imposition of a sentence below the standard range after considering Hardy's youth and TBI. As for deterrence, the court in Bassett did recognize that punishment is less compelling in these circumstances because " 'the same characteristics that render juveniles less culpable than adults'—their immaturity, recklessness, and impetuosity—make them less likely to consider potential punishment." 192 Wn.2d at 88. However, in considering the goals together, we conclude they are served by this sentence.

Therefore, under the two-pronged categorical bar analysis, we hold that sentencing youthful offenders to consecutive firearm enhancements does not qualify as cruel punishment under article I, section 14.

III.  VPA and Restitution Interest

Hardy argues this court should strike the VPA because he is indigent and recent amendments to the statute bar courts from imposing such fees on indigent defendants. Hardy was sentenced on March 3, 2023, and the 2023 amendments that prohibit courts from imposing the VPA when the defendant is indigent went into effect on July 1, 2023. See Laws of 2023, ch. 449, § 1. These amendments apply to matters pending on direct appeal. State v. Ellis, 27 Wn. App. 2d 1, 16, 530 P.3d 1048 (2023), review granted, 4 Wn.3d 1009, 564 P.3d 547 (2025). The State agrees that the VPA should be stricken. Thus, we remand to strike the VPA from Hardy's judgment and sentence.

Next, Hardy requests this court to remand so the sentencing court may consider whether to waive interest on the ordered restitution, given the 2023 statutory

amendments to RCW 10.82.090.[16] See LAWS of 2022, ch. 260, § 12. The State

conceded at oral argument that sentencing courts do have discretion to consider

interest on restitution.[17] See State v. Morgan, 4 Wn.3d 261, 270-71, 562 P.3d 360

(2025) (RCW 10.82.090 gives "courts flexibility to waive or reduce the interest on

restitution," and "this amendment does not include an exception for interest on

restitution owed to L&I."). However, unlike the VPA amendments, the amendment to the

restitution interest statute went into effect on January 1, 2023, and was in effect at the

time of Hardy's sentencing on March 3, 2023. See LAWS of 2022, ch. 260, § 12.

However, Hardy did not request the court to exercise its discretion to waive restitution

interest either in his sentencing memorandum or at sentencing, where he represented

himself. At the sentencing, the State confirmed Hardy agreed to the proposed restitution

order. The pattern form for the written order included a specific section on interest and

on restitution owed, with a box the court could check if it chose to consider the factors in

RCW 10.83.090(2) and to exercise its discretion to waive interest on restitution.[18] But

the court did not check this box.[19] As Hardy could have challenged the imposition of

---

[16] The new subsection to the statute states that a "court may elect not to impose interest on any restitution the court orders. Before determining not to impose interest on restitution, the court shall inquire into and consider the following factors . . . ." RCW 10.82.090(2).

[17] Wash. Ct. of Appeals oral argument, State v. Hardy, No. 85086-5-I (March 7, 2025), at 8 min., 45 sec., through 9 min., 10 sec., video recording by TVW, Washington State's Public Affairs Network, https://tvw.org/video/division-1-court-of-appeals-2025031236/?eventID=2025031236.

[18] The same page of the order that addresses interest on restitution includes the signatures of the court and the parties, through counsel.

[19] At the sentencing hearing, the State raised the topic of legal financial obligations (LFOs) generally, and the court stated it was "waiving any other nonmandatory legal financial obligations." However, we ordinarily do "not examine the sentencing court's oral statements to determine the court's intent because those statements are not part of the final judgment." State v. Starr, 16 Wn. App. 2d 106, 110, 479 P.3d 1209 (2021). Instead, the written order or judgment controls. Id. See also State v. A,M., 163 Wn. App. 414, 424, 260 P.3d 229 ("Where written findings and conclusions have an unambiguous meaning, they are not susceptible to being given a different meaning on appeal through resort to an examination of the lower court's oral ruling.").

interest on restitution below, but did not do so, we decline to consider it for the first time on appeal. RAP 2.5(a).

## CONCLUSION

We affirm Hardy's convictions but remand for the sentencing court to strike the VPA.

Chung, J.

WE CONCUR:

, ACJ